MONROE, C. J.
Defendant, having been prosecuted for murder and convicted of manslaughter, prosecutes this appeal. On the trial, his counsel excepted to the overruling of an objection to an alleged dying declaration, offered by the state, and by way of laying a foundation for the admission of which the coroner had given considerable testimony, out of the presence of the jury. He there states that he was called to see a boy who had been shot, reached him about 5:30 or 6 o’clock a. m., and was informed by him that he did not know the name of the man who had shot him, but had been told that it was Mike Buchanan, and that he had seen him and would recognize him; that the constable was then out seeking Buchanan and that he (witness) proceeded to examine the boy, and, having done so, told him “that there was nothing to be done for him unless an operation was performed for him right away, or he would die in a little while”; that “they” (referring to the persons who were with the boy) “said that they would take him home, to his parents, and find out whether they would consent to an operation.” Witness then left the party, and, about 11 o’clock, as he was driving to the residence of the boy’s parents, in order to see him again, he met them, on their way to the same place, the boy being in a wagon; that he stopped the wagon, and had the boy to identify Buchanan as the man who had shot him, and to identify the pistol that was used. He concludes his examination in chief as follows:
“So I said to him ‘You arc going to die in a short while;’ and he answered, T know it, Doctor.’ Q. What did he answer? A. T know it.’ That was all that I said to him.”
The cross-examination of the witness reads as follows:
“Q. Who was with you the last time you saw him, when he was in the wagon? A. Mr. Eli Spelk, Gas Chargois, Paul Martin, Jr., Alexander Broussard, Meo Foreman, Wilson Foreman, and there were three or four colored men there; 1 couldn’t tell the names; I don’t know who they were. Q. All of these men were standing around where they could hear the conversation? A. They were all around, not very far; I don’t know how far; I didn’t notice; I was in the wagon, talking to the boy; I couldn’t tell you how close they were standing. Q. Did you not testify, on the preliminary examination that was held in this case, in reply to a question put to you by the judge of the court, as to what Tanas Martin said when you told him that he was going to die? A. I believe I said he knew he was going to die. Q. Didn’t you say that he didn’t say a word — he was very calm and cool. A. I don’t think I said that. Q. You didn’t say that? A. No, sir. Q. Did you not, in the presence of Cas Chargois, Paul Martin, Meo Foreman, and Wilson Foreman, tell this negro that was holding Tanas Martin at the time to ring you up if an operation was necessary — if they wanted an operation? A. I told them, as soon as they got home, if they consented to it. Q. So that you would operate on this man if they had sent you a message to that effect? A. I would have, if I had got that before he died; yes, sir. Q. So there was a doubt in your mind as to whether he was going to die? A. I knew he couldn’t live very long. Q. AVhy did you want to operate on a man, if you thought he was going to die? A. The medical science will always give the benefit of the doubt of any kind. AVithout an operation, I was positive he would die. Q. But, with an operation, you thought he had a chance? A. I told him, ‘Maybe you have a chance,’ yes. I told him that. I told him that was the only chance for him, if he did anything at all. * * * Yes, I said, without an operation that he was positively going to die, and with an operation maybe there would be a chance for him; but I didn’t say, positively, that he would live. * * * Q. AVhat did he say when you said that? A. He didn’t say anything at all. I didn’t tell him that. I was talking to his brother. * * * Q. Were you near enough for Tanas to hear you? A. I guess I was — ten feet — he could hear me; yes. *423 * * * Q. And you made both statements in the hearing of Tanas Martin, in the presence and hearing of Tanas Martin? A. Well, he could hear me. My statement was that he positively was going to die without an operation, and I told him, ‘You are going to die in a short whilebut I told his brother there was some chance, with an operation. * * * Q. Now, it was after you told him that he made this statement to you about identifying Mike Buchanan as the man who shot him? A. It was right there; yes, sir. Q. You did not know at that time whether you were going to operate or not? A. No, sir. Q. He didn’t know? A. No, sir. Q. It was all dependent on getting home, where his father and mother were? A. Yes, sir.”
[1] Counsel then objected to the admission of the alleged dying declaration, on. the grounds that it was not shown that deceased was informed that he was in a dying condition; that, to the contrary, the witness held out some hope of recovery, by stating that, if an operation were performed, he might have some chance to recover. The court, after some further interrogation of the witness, announced that it would admit the declaration. Counsel for defendant then asked that, before admitting it, he be permitted to “further traverse the witness’ testimony, by introducing other witnesses who were present at the time that the alleged dying declaration was made, and who would testify to a different state of facts from that testified to by the witness on the stand, namely, Cas Chargois, Paul Martin, Meo Foreman, and Wilson Foreman.
The court denied the request, but stated that the witnesses so tendered might testify before the jury in contradiction of the testimony given by the coroner. And it appears that two of those whose names are mentioned did so testify. It also appears that there were two eye-witnesses who testified that Buchanan did the shooting. It would seem, from the testimony of the coroner, that he at one time told the boy that he would die in a little while unless an operation were performed right away, and that at another time he told the boy that he would die in a short time, and told his brother, within the hearing of the boy, that there was a chance that his life might be saved by an operation; but we are unable to determine the sequence or relation of the coroner’s statements and of the answer of the boy, “I know it, Doctor,” to the identification of the defendant, and the question appears to us to be an important one; for if the boy, being told that he was going to die, so believed, and in that belief identified the defendant as his slayer, the- declaration is within the rule. On the other hand, if, being told that he was going to die, he said, “I know it,” but was after-wards told that his life might be saved by an operation, and in the changed frame of mind brought about by that information he identified the defendant, his declaration to that effect was not within the rule. And the difficulty arising from the uncertainty of the coroner’s testimony renders more important what we conceive to be the error of the trial judge in referring the testimony offered by defendant for his consideration to the jury. A similar ruling seems to have been made in State v. Molisse, 36 La. Ann. 922, and it was there said:
“The decision of that point” — i. e., whether a declaration, offered as such, was admissible as a dying declaration — “is not within the province of the jury, but, like all questions involving the admissibility of evidence, it is of • the exclusive province of the court, and for that reason alone it comes within our limited criminal jurisdiction. Wharton, Ev. p. 681; State v. Trivas, 32 La. Ann. 1088 [36 Am. Rep. 293]. * * * We are therefore clear in our conviction that the judge should have heard the witnesses whose testimony was offered by the accused on 'that vital point, and that he should not have ruled on the admissibility of the dying declaration before hearing and considering their testimony; and to that end we are compelled to remand the cause.”
We therefore conclude that the ruling here complained of was erroneous, and requires the reversal of the judgment.
[2] Another bill was reserved to the overruling by the court of defendant’s objection that the following question, propounded by the prosecuting officer to a state witness, was leading, to wit:
*425 “Are you positive, and are you willing to swear, that Mike Buchanan, the accused here,, is the man that fired the shot that killed Tanas Martin?”
The statement per curiam is that the witness had already testified that Buchanan was the/man who fired the shot. The question propounded was not, therefore, a leading one in the objectionable sense.
[3] Still another bill was reserved to the-overruling of the objection that the following question, propounded by the prosecuting officer to a witness called by defendant, was embarrassing, as requiring the witness to declare whether the testimony of another witness was true or false, to wit:
“Mr. Chargois, are you willing to swear before this jury that Tanas Martin, the deceased, did not make the dying declaration to Dr. Duhon, which Dr. Duhon testified yesterday that he made?”
The question called for no criticism of Dr. Duhon’s testimony, but related to a fact which was, or was not, within the knowledge of the witness, and the existence or nonexistence of which was to be established for the benefit of the court and jury. That Dr. Duhon or any other witness had testified upon the subject could not estop the state from introducing other evidence.
For the reasons assigned in our review of the rulings on the bills first considered, it is ordered that the conviction and sentence appealed from be set aside, and that the ease be remanded, to be further proceeded with according to law.